```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
PARTNER CANADA BIOMEDICAL                                      :
INTERNATIONAL, INC.,                                           :
                                                               :
                                    Plaintiff,                 :          17-CV-5919 (VEC)
                                                               :
                                                               :            MEMORANDUM
                    -against-                                  :         OPINION AND ORDER
                                                               :
AMGEN, INC.                                                    :
                                                               :
                                    Defendant.                 :
-------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/17/2018

VALERIE CAPRONI, United States District Judge:

Partner Canada Biomedical International, Inc. ("PCBI") sued Amgen, Inc. ("Amgen") for breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment. Amgen contracted PCBI to assist Amgen with the sale of one of its manufacturing facilities. PCBI claims that it is entitled to a "success fee" under the contract because PCBI identified a buyer for the facility and, in its view, effected the sale of the facility to that buyer. Amgen moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Notice of Mot., Dkt. 35. For the following reasons, Amgen's motion to dismiss is GRANTED. PCBI may, however, move for leave to amend its claim for breach of the duty of good faith and fair dealing no later than **July 25, 2018**.

# BACKGROUND[1]

## I. The Operative Contract

Amgen, a pharmaceutical company, contracted with PCBI, a consulting firm, to "assist [Amgen] with the identification, qualification, approach, [and] assessment of potential buyers" for the sale of one of Amgen's manufacturing facilities. Am. Compl., Dkt. 29, Ex. A ¶ 1.1(a). Under the contract between Amgen and PCBI (the "Contract"), PCBI first had to compile a list of potential buyers and submit the list to Amgen for its approval. *See id.* Ex. A at 10. PCBI was then required to contact the potential buyers and present the proposed transaction to them. *See id.* After ascertaining which parties were interested in the transaction, PCBI was required to submit a final list of interested buyers to Amgen. *See id.*

Amgen was required to pay PCBI a monthly "service fee." *Id.* Ex. A ¶ 3.1(a). Additionally, the Contract required Amgen to pay PCBI a "success fee" if "the related transaction" was "completed as a result of the direct or indirect efforts of [PCBI]" and "effected" during the Contract's term or during a 12-month "tail period" following the Contract's termination date.[2] *Id.* Ex A. ¶ 3.1(b). The term of the Contract began on December 16, 2013, and (after an extension) terminated on March 31, 2014. *See id.* Ex. A ¶ 2.1; *id.* ¶ 18. The Contract's 12-month "tail period," therefore, terminated on March 31, 2015. *See id.* ¶ 19.

---

[1] On this motion to dismiss, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to the Plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

[2] Specifically, the portion of the Contract establishing the success fee states: "[Amgen] shall pay to [PCBI] a success fee, applicable and against a written invoice presented by [PCBI], based on [a calculation] of the purchase price made to [Amgen] for the sale (or other property interest transfer) of the Facility where the related transaction is completed as a result of the direct or indirect efforts of [PCBI] and is effected during the term (or any renewal) of this Agreement and for twelve (12) months following the expiration or termination of this Agreement (or any renewal) . . . ." Am. Compl., Ex. A ¶ 3.1(b).

## II. PCBI Identifies AstraZeneca as a Potential Buyer

One of the candidates on PCBI's initial list of potential buyers was AstraZeneca. *See id.* ¶ 34. After Amgen's approval of the initial list, in January 2014, PCBI approached AstraZeneca and presented the proposed sale in a detailed white paper. *See id.* ¶ 35.

Shortly after AstraZeneca's internal evaluation of the facility, AstraZeneca told PCBI that it was no longer interested in purchasing the facility. *See id.* ¶ 38. Accordingly, PCBI removed AstraZeneca from the list of potential buyers. *See id.* ¶ 39. For the remainder of the Contract's term—approximately two months—PCBI continued identifying and interviewing other prospective buyers but had no further contact with AstraZeneca. *See id.*

## III. AstraZeneca Contacts Amgen Directly and Proposes Purchasing the Facility

After the Contract's "tail period" began, AstraZeneca apparently reconsidered its decision and contacted Amgen directly. *See id.* ¶ 40. Over the next few months, and still within the tail period, AstraZeneca and Amgen engaged in direct negotiations for the purchase. *See id.* ¶¶ 40–41. Within the tail period of the Contract, AstraZeneca and Amgen entered into a preliminary "handshake agreement" for the sale of the facility. *See id.* ¶ 45. PCBI was not involved in these negotiations or in the handshake agreement. *See id.* ¶¶ 40–45.

Two months after the Contract's tail period ended, AstraZeneca submitted a "letter of intent" for the purchase of Amgen's facility. *See id.* ¶ 47. A few months later, in July 2015, AstraZeneca and Amgen entered into a formal Purchase and Sale Agreement. *See id.* ¶ 48; Handelsman Decl., Dkt. 37, Ex. D. In September 2015, AstraZeneca and Amgen completed the transaction, and AstraZeneca took ownership of the facility. *See* Am. Compl. ¶ 49.

## DISCUSSION

### I. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding such a motion, "the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

The parties agree that the Contract is governed by New York law. *See* Am. Compl., Ex. A ¶ 5.5. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 48–49 (S.D.N.Y. 2004); *see also RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003). The court must resolve any ambiguities in the contract in favor of the non-moving party. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002). Contractual terms are unambiguous if they have "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Met. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (internal quotation marks omitted). Contractual "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations." *Id.* And the fact that one party may "strain[] the contract language beyond its reasonable and ordinary meaning" does not render the contract ambiguous. *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 598 (2d Cir. 2005).

## II. Amgen's Motion to Dismiss PCBI's Claim for Breach of Contract Is Granted

PCBI claims that Amgen breached the Contract by failing to pay PCBI a success fee. *See* Am. Compl. ¶ 75. As the Court has discussed, PCBI was entitled to a success fee only if the relevant "transaction" was "completed as a result of the direct or indirect efforts of [PCBI]" and was "effected" during the Contract's term or tail period. *Id.* Ex. A ¶ 3.1(b). PCBI's claim fails for two reasons: first, the relevant "transaction" was not "effected" during the Contract's term or its tail period and, second, the transaction was not "completed as a result of the direct or indirect efforts" of PCBI.

### A. The Relevant "Transaction" Was Not "Effected" During the Contract's Term or Tail Period

The Contract requires the relevant "transaction" be "effected" during the term of the Contract or during the tail period. The relevant paragraph in the Contract makes it unambiguously clear that the sale of Amgen's facility had to be fully completed before the end of the tail period. *See id.* Ex. A ¶ 3.1(b). That paragraph begins by calculating the success fee as a percentage "of the purchase price made to [Amgen] for the sale (or other property interest transfer) of the Facility." *Id.* Immediately after that phrase, the Contract states that "the *related transaction*" must be "effected" during the Contract's term or tail period. *Id.* (emphasis added). The word "transaction," then, clearly refers back to the "sale (or other property interest transfer)" of the facility. Additionally, the plain meaning of the word "effect[]" is "[t]o bring about" or "to make happen." *Black's Law Dictionary* (10th ed. 2014) (definition of "effect" (vb.)); *see also id.* (definition of "effect" (n.)) ("Something produced by an agent or cause; a result, outcome, or consequence."). Taking this paragraph of the Contract as a whole, then, PCBI was entitled to the success fee only if Amgen's facility was sold before the end of the tail period.

5

AstraZeneca and Amgen entered into a "handshake agreement" within the tail period, but they did not sign a letter of intent, sign a purchase agreement, or transfer ownership of the facility until after the tail period concluded. Am. Compl. ¶¶ 45–48. The handshake agreement covered only the most basic terms of the transaction and did not result in the transfer of any legal interest, *see id.* ¶ 45; thus, the handshake agreement did not "effect" the transaction. And because no other concrete steps were taken towards a sale during the tail period, *see id.* ¶¶ 46–48, the sale was not "effected" during that time. As a result, under the unambiguous terms of the Contract, PCBI is not entitled to the success fee.[3] *Cf. Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 363 (S.D.N.Y. 2016) (dismissing a broker's claim for breach of contract when the broker brought a buyer and seller together but the ultimate sale was not consummated until four years after the expiration of the broker's contract term; "[A] broker is not entitled to a commission on a sale negotiated after the term of his employment.").

PCBI argues that it "effected" the relevant "transaction" during the tail period by contacting and circulating materials to AstraZeneca during this time. *See* Pl.'s Mem. of Law, Dkt. 42, at 15. In PCBI's view, the parties could not have intended the term "effected" to refer to the final sale of the facility because sales of pharmaceutical manufacturing plants "often take years to negotiate and close" and yet the tail period consisted only of one year. *Id.* PCBI raises this argument for the first time in its opposition brief, and there are no allegations in the pleadings to support it.[4] Because the term "effected" is unambiguous on its face, PCBI cannot

---

[3] The Court need not decide whether the "transaction" was "effected" when the letter of intent was signed, when the final purchase agreement was signed, or when AstraZeneca took ownership of Amgen's facility because all of those events took place after the end of the tail period. Am. Compl. ¶¶ 46–48.

[4] The only allegations on this subject in the Amended Complaint relate to the negotiations between AstraZeneca and Amgen. It took them only four months to negotiate a Purchase and Sale Agreement, *see* Am. Compl. ¶ 48, perhaps undercutting PCBI's claim that such negotiations "often take years." In any event, even if the Amended Complaint had alleged that sales of pharmaceutical facilities frequently take longer than a year to effectuate, that collateral fact would not alter the terms of the Contract, which are unambiguous.

6

create an ambiguity through unsubstantiated and untimely assertions. *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

In short, PCBI fails to state a claim for breach of contract because it fails to allege that one of the conditions precedent to the success fee—completion of the sale during the Contract's term or tail period—was fulfilled.

### B. The Relevant "Transaction" Was Not "Completed as a Result of the Direct or Indirect Efforts" of PCBI

PCBI's breach of contract claim also fails because it does not allege that the AstraZeneca-Amgen transaction was "completed as a result of [PCBI's] direct or indirect efforts." Am. Compl., Ex. A ¶ 3.1(b). This clause in the Contract unambiguously requires a causal link between PCBI's efforts and the sale of Amgen's facility.

PCBI did nothing more than identify AstraZeneca as a possible buyer and circulate a white paper to AstraZeneca. *See id.* ¶¶ 32–36. Those efforts are too attenuated from the eventual sale to assert plausibly that the sale was "completed as a *result*" of PCBI's efforts. *Id.* Ex. A ¶ 3.1(b) (emphasis added).[5] Moreover, it is undisputed that after PCBI's efforts, AstraZeneca declined to pursue the purchase, *see id.* ¶¶ 38–39, thus severing any causal link between PCBI's efforts and the eventual sale. While AstraZeneca later reconsidered its decision not to pursue the purchase, the Amended Complaint includes no allegations about further efforts by PCBI or about AstraZeneca's internal decision-making process that plausibly suggest that AstraZeneca's decision to reconsider purchasing the facility was "a result of" PCBI's efforts. *See id.* ¶ 40. Nor did PCBI have any role in facilitating the negotiations between AstraZeneca

---

[5] PCBI was compensated for these efforts as part of the Contract's "service fee." *See* Am. Compl. ¶ 50. The parties dispute only whether PCBI was entitled to the "success fee" based on those efforts. *See id.*

and Amgen.  *See id.* ¶¶ 40–49.  In short, PCBI has failed to state a plausible claim that its efforts were causally related to the transaction between AstraZeneca and Amgen.

PCBI argues that the Contract required it only to "bring [AstraZeneca and Amgen] together" in a "frame of mind" that could eventually "permit[] their working out the terms of their agreement."  Pl.'s Mem. of Law at 17 (quoting *Salzano v. Pellillo*, 4 A.D.2d 789, 790 (2d Dep't 1957)).  PCBI analogizes itself to a real estate broker, citing a line of New York cases that holds that brokers are entitled to commissions as long as they produce a "ready, willing, and able" buyer.  *Id.* (citing *Wagner v. Derecktor*, 306 N.Y. 386, 390 (1954); *Eugene J. Busher Co. v. Galbreath-Ruffin Realty Co.*, 22 A.D.2d 879, 879 (1st Dep't 1964), *aff'd*, 15 N.Y.2d 992 (1965); *Salzano*, 4 A.D.2d at 790).

PCBI's argument fails.  First, PCBI did not produce a "willing" buyer when it introduced AstraZeneca to Amgen; AstraZeneca expressly declined the purchase, and PCBI removed AstraZeneca from its list of interested parties.  *See* Am. Compl. ¶¶ 38–39.  Second, under the cases that PCBI cites, a broker must "generate[] a chain of circumstances which proximately [lead] to" the sale.  *Eugene J. Busher Co.*, 22 A.D.2d at 879; *see also Salzano*, 4 A.D.2d at 790 (a broker is entitled to a commission only when "a sale is effected through his agency *as the procuring cause*" (emphasis added)).  As the Court has discussed, no allegations in the Amended Complaint plausibly suggest that PCBI's efforts were the proximate cause of the sale.

Third, and most important, every broker's contract is different, and brokers—like any other party—are bound by the specific terms of their contracts.  *See Buffalo Pyramid Brokerage Co. v. Nat. Holdings, Inc.*, No. 97-CV-0002E, 1998 WL 543754, at *7 (W.D.N.Y. July 30, 1998) ("[A] broker asserting a right to a commission under an 'extension clause,' or 'tail provision,' must demonstrate that it has satisfied the conditions stated therein. . . . [C]ourts also hold brokers

8

to the letter of such extension clauses and have denied recovery of commissions where brokers have failed to demonstrate that they had met the agreed-to prerequisites to an entitlement to such." (collecting cases)). The Contract required PCBI to do more than an ordinary real estate broker in order to earn the success fee. Regardless of whether PCBI introduced Amgen to a ready, willing, and able buyer, PCBI was not entitled to the success fee unless the actual sale was causally related to PCBI's efforts. *See* Am. Compl., Ex. A ¶ 3.1(b). This requirement reflects an understanding between PCBI and Amgen that PCBI's entitlement to the success fee would be narrower than an ordinary broker's entitlement to a commission.

For all these reasons, PCBI has failed to state a claim for breach of contract.

### III. Amgen's Motion to Dismiss PCBI's Claim for Breach of the Duty of Good Faith and Fair Dealing Is Granted

New York law implies a covenant of good faith and fair dealing in every contract, "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006). For a plaintiff to state such a claim, he "must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits." *Aventine Inv. Mgmt. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dep't 1999); *see also Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). As with any other cause of action, conclusory allegations of bad faith are not sufficient to state a claim. *See Int'l Techs. Mktg.*, 157 F. Supp. 3d at 368; *Phoenix Capital Invs. LLC v. Ellington Mgmt. Grp., LLC.*, 51 A.D.3d 549, 550 (1st Dep't 2008).

PCBI alleges that Amgen intentionally delayed its negotiations with AstraZeneca in order to ensure that the sale would take place after the Contract's tail period concluded. *See* Am. Compl. ¶ 84. But PCBI offers no basis for that conclusory assertion or any factual allegations to

support it. Without more specific allegations as to how Amgen intentionally delayed the sale, PCBI's claim is conclusory and insufficient as a matter of law.[6]

## IV. Amgen's Motion to Dismiss PCBI's Claim for Unjust Enrichment Is Granted

"The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012); *see also Golden Pac. Bancorp v. Fed. Dep. Ins. Co.*, 273 F.3d 509, 519 (2d Cir. 2001). When a written contract exists between the plaintiff and the defendant, the plaintiff may proceed on a theory of unjust enrichment only if the contract is silent as to the parties' obligations in the situation at bar. *See Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225, 228 (1st Dep't 1993) (citing *Smith v. Kirkpatrick*, 305 N.Y. 66, 72 (1953)). In such a case, the plaintiff must show that circumstances independent of the contract "create an equitable obligation running from the defendant to the plaintiff," including, for example, situations in which the defendant "has received money to which he or she is not entitled." *Corsello*, 18 N.Y.3d at 790.

PCBI argues that the Contract did not cover the services that it rendered. *See* Pl.'s Mem. of Law at 24–27. In PCBI's view, the Contract required PCBI to find a buyer willing to comply with all conditions in Exhibit D of the Contract. *See id.* PCBI argues that because AstraZeneca purchased the facility without complying with all of those conditions, the Contract is silent as to the situation at bar, and Amgen has inequitably received the benefit of PCBI's services. *See id.* PCBI's argument is misplaced. As an initial matter, Amgen compensated PCBI in the form of a "service fee" for PCBI's efforts, *see* Def.'s Mem. of Law at 25; in no way, then, has Amgen

---

[6] Because PCBI's claim for breach of the duty of good faith and fair dealing fails on its merits, the Court need not resolve the parties' dispute over whether the claim is duplicative of PCBI's claim for breach of contract.

inequitably retained the benefit of PCBI's services without compensation. More important, the Court's conclusion that PCBI is not entitled to the success fee does not depend on whether AstraZeneca complied with all of the conditions in Exhibit D. As the Court has discussed, PCBI has failed to allege that the conditions precedent to Amgen's obligation to pay a success fee were fulfilled; even if AstraZeneca *had* complied with all of the conditions in Exhibit D, then, PCBI would still not be entitled to a success fee. Put differently, the parties' contract is not silent on the situation at bar, so PCBI may not proceed on a theory of unjust enrichment. *See Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987).

For all these reasons, PCBI has failed to state a claim for unjust enrichment.

## V. PCBI May Move for Leave to Amend the Amended Complaint

If a pleading fails to survive a motion to dismiss, a court should "freely" grant the plaintiff leave to amend the pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2).

Here, PCBI's claims for breach of contract and unjust enrichment fail based on the unambiguous language of the Contract; thus, additional allegations cannot cure the deficiencies in those claims. Additionally, PCBI has already amended its complaint once, and it has offered no indication that it could add new allegations that would withstand a motion to dismiss those claims. The Court, therefore, will not allow PCBI to move for leave to amend those claims.

The Court's decision as to PCBI's claim for breach of the duty of good faith and fair dealing, however, depends in part on PCBI's failure to offer nonconclusory allegations. In particular, PCBI has failed to allege a factual basis for its assertion that Amgen intentionally delayed the sale of its facility to avoid paying PCBI the success fee. The Court will, therefore, allow PCBI to move for leave to file a Second Amended Complaint only as to its claim for breach of the duty of good faith and fair dealing. Any motion must be made no later than

**July 25, 2018**.  If PCBI fails to move for leave to amend by that time, the Court will dismiss this case.  PCBI's motion must follow this Court's Individual Practices in Civil Cases, Rule 3(F).

## CONCLUSION

For all the foregoing reasons, Amgen's motion to dismiss the Amended Complaint is GRANTED.  PCBI may move for leave to amend its claim for breach of the duty of good faith and fair dealing no later than **July 25, 2018**.

The Clerk is respectfully directed to close the open motion at Dkt. 35.

**SO ORDERED.**

**Date: July 17, 2018**  **VALERIE CAPRONI**
  **New York, New York** **United States District Judge**